**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT CINCINNATI**

| | | |
|---|---|---|
| JOHN STEVEN TEAGUE,<br><br>Plaintiff,<br><br>vs.<br><br>JAY NOBLE, et al.,<br><br>Defendants. | ) | Case No.: 1:21-cv-00318<br><br>Judge Michael R. Barrett |

**ORDER**

This matter is before the Court on Plaintiff's Motion to Compel Defendants to Respond to Discovery and Provide Deposition Testimony. (Doc. 19). Defendants filed a memorandum in opposition to Plaintiff's Motion to Compel and a companion Motion for Protective Order. (Doc. 21). Plaintiff filed a joint reply (Doc. 22) in support of his Motion to Compel and memorandum in opposition (Doc. 23) to Defendants' Motion to Compel. Finally, Defendants filed a reply (Doc. 24) in support of their Motion for Protective Order.

## I. Background Facts as Alleged in the Complaint

Plaintiff John Steven Teague is the former Chief of Police of the Village of Bethel, Ohio. (Doc. 1 (¶ 1)). He was initially appointed Chief on April 11, 2019 (pursuant to Ohio Rev. Code § 737.15), with final appointment by the Village Council on November 14, 2019. (*Id.* (¶ 10)). The Village Council is the elected legislative authority for the Village, a public body to which the Ohio Open Meetings Act (Ohio Rev. Code § 121.22) applies and a public entity to which the Ohio Public Records Act (Ohio Rev. Code § 149.43) likewise applies. (*Id.* (¶¶ 47, 48)).

Defendant Jay Noble became Village Mayor on January 1, 2020. (*Id.* (¶ 22)). Teague's political views conflicted with Noble's, at least with regard to the Black Lives Matter protests held in the wake of George Floyd's murder. (*See id.* (¶¶ 24–26, 31–34)). One such protest occurred in Bethel on June 14, 2020, which resulted in very negative publicity for the Village. (*Id.* (¶¶ 31, 36, 37)). Unrelated to the protest, Teague and Noble had several disagreements about actions Noble wanted Teague to take in his capacity as Chief, actions that Teague believed were "unethical or illegal." (*Id.* (¶ 41)). Between not liking his politics and not liking when Teague said "no" to him wanting traffic ticket quotas and private security service—and following Teague's insistence that he and his officers were entitled to be paid at an overtime rate for all hours worked during the state of emergency declared because of the COVID-19 pandemic—Noble decided to terminate Teague. (*Id.* (¶¶ 41, 44–46)). To this end, Noble conducted secret, non-public meetings with members of the Village Council. (*Id.* (¶ 46, 49)). During these meetings Noble made false and malicious statements about Teague to garner support for his plan. (*Id.* (¶ 51)).

Noble asked Teague to meet with him on January 8, 2021. (*Id.* (¶ 52)). When Teague arrived, he was met not only by Noble, but also the Village Solicitor. (*Id.*). Noble told Teague that he was being placed on paid administrative leave, effective immediately, pending termination. (*Id.*). Noble also told Teague that he *and the members of council* had "lost confidence" in Teague's ability to lead the Bethel Police Department, with reference to the draft report from Chief Hughes[1] that supported *the Village's*

[1] The Village of Bethel retained Scott L. Hughes, Chief of Police of Hamilton Township, Ohio, in September 2020 to conduct an audit and review of the Bethel Police Department. (Doc. 1 (¶ 45)). This occurred, Plaintiff alleges, because "Mayor Noble needed a scapegoat for the negative press received by the Village as a result of the [Black Lives Matter] demonstration and counterprotests which occurred in the Village in June 2020, and Chief Teague became his target." (*Id.* (¶ 44)).

determination that Teague be removed. (*Id.* (¶ 53)). Failing Teague's resignation, Noble threatened to file formal charges that would be heard at the next Village Council meeting in February. (*Id.*). Teague did not resign at this time. (*Id.* (¶ 56)).

On January 18, 2021, the Village publicly published the Hughes Report. (*Id.* (¶ 57)). Its findings were based in part on Hughes' interview with Noble, who repeated the same false and malicious statements (made to members of the Village Council) about Teague. (*Id.*) On February 4, 2021, Noble publicly published and filed with the Village Council (pursuant to Ohio Rev. Code § 737.171), "Administrative Charges Against Police Chief Steve Teague and Recommendation for Removal from Office" [2]. (*Id.* (¶ 60)). [3] The Charges included numerous false, stigmatizing, and malicious statements by Noble against Teague. (*Id.* (¶ 61)). Throughout, Noble characterized Teague as incompetent, unintelligent, unprofessional, and as mistreating those who worked for him. (*Id.* (¶ 62)). Teague was provided a copy of the Charges and told that a hearing (before Village Council) would take place on February 11, 2021. (*Id.* (¶ 60)). Copies of the Charges also were distributed to the media. (*Id.* (¶ 64)).

Teague made numerous public records requests (pursuant to Ohio Rev. Code § 149.43 *et seq*.) to the Village. (*Id.* (¶ 68)). Among the records the Village refused to produce were text messages between members of the Village Council and/or Mayor

[2] (*See* Doc. 1-1).

[3] Ohio Rev. Code § 737.171 sets forth the circumstances under which a chief of police—statutorily known as "marshal of the village"—may be removed from office for cause, the procedure that must be followed, and the decision-making authority. (Doc. 1 (¶ 14)).

Noble and Chief Hughes' retention agreement (and other documents related to his report). (*Id.*).

The Village proceeded first on February 11, 2021 with the testimony of Mayor Noble. (*Id.* (¶ 71)). When cross-examined, Noble made a number of damning admissions that undermined the Charges he filed. (*Id.* (¶¶ 72, 73)). At the conclusion of Noble's testimony, the hearing was continued in progress to March 2, 2021 and rescheduled (by mutual agreement) to March 11, 2021. (*Id.* (¶¶ 74, 75)). On (Friday) March 5, 2021, Noble decided to "dismiss" the Charges (in violation of Ohio Rev. Code § 737.171[4]); he demanded that Teague report for duty on (Monday) March 8, 2021.[5] (*Id.* (¶¶ 77, 82)). Noble issued a memorandum (on March 8, 2021) to the Village Council and Teague, which stated that he had "reconsidered" his position such that he would dismiss the Charges and convert them to a written reprimand. (*Id.* (¶ 85)).

Teague was harassed upon his return to work. For example, despite a 2005 ordinance that waived the residency requirement for the Chief of Police, out of the blue the Village claimed that it didn't apply to Teague and, alternatively, it was considering revoking the waiver as it applied to him. (*Id.* (¶¶ 87–89)). Then, on March 15, 2021, Noble and the Village Solicitor met with Teague to review the promised "Written Reprimand." (*Id.* (¶ 90)). Noble omitted some of the "most outrageously false and malicious statements" from the since-dismissed Charges, but nonetheless repeated

[4] Teague reads § 737.171 to allow the legislative authority *alone* (here, Village Council) the right to dismiss a mayor's written charges and *only* after he, as the accused, has been given the opportunity to "answer" them.

[5] Teague did not report for duty until (Tuesday) March 9, 2021. (Doc. 1 (¶¶ 82, 83)).

many other "false, incomplete and incorrect" allegations in the reprimand. (*Id.* (¶ 91)). Teague asked to appeal; both Noble and the Village Solicitor responded that no appeal process was available to him. (*Id.* (¶ 92)).

Teague submitted his written resignation on March 17, 2021, explaining that the false and malicious statements in the Charges and the Written Reprimand made it "impossible" for him to effectively perform his duties as Chief of Police. (*Id.* (¶ 94)). On March 24, 2021, Teague sent a written request to the Village for a public "name-clearing" hearing. (*Id.* (¶ 97)). He received no response. (*Id.* (¶ 98)).

Plaintiff brings nine claims against Noble and the Village of Bethel: due process violations under 42 U.S.C. § 1983 (Count I); defamation (Count II); false-light invasion of privacy (Count III); intentional infliction of emotional distress (Count IV); payment of wages owed (Count V); wrongful and retaliatory discharge (Count VI); malicious civil prosecution/litigation (Count VII); intentional interference with an employment relationship (Count VIII); and violation of the Open Meetings Act, Ohio Rev. Code § 121.22 (Count IX).

## II. Plaintiff's Motion to Compel[6]

**Privilege Log**. Defendants have asserted the attorney-client privilege, work product protection, and the "executive session" privilege[7] in their written discovery

[6] The Court held a status conference (by telephone) on December 13, 2021, at which time discovery dispute issues were discussed. (*See* 12/13/2021 Minute Entry). At the end of the dialogue, the Court granted Plaintiff permission to file a motion to compel (after January 1, 2022) if parties failed to reach an agreement in the interim. (*Id.*)*; cf.* Part I.D., Standing Order on Civil Procedures (available at https://www.ohsd.uscourts.gov/FPbarrett). Plaintiff's Motion (Doc. 19) followed on February 3, 2022.

[7] As will be discussed *infra*, Plaintiff disputes the validity of an "executive session" privilege.

responses and are withholding information and documents on these bases. However, they have failed to produce a privilege log as required under Fed. R. Civ. P. 26(b)(5)(A)[8] and S.D. Ohio Civ. R. 26.1(a)[9], even despite Plaintiff's requests[10]. In their responsive memorandum, Defendants state they "will provide a privilege log in this case." (Doc. 21 PAGEID 241). Yet they failed to do so by the time Plaintiff filed his reply in support of his Motion to Compel. (Doc. 22 PAGEID 272). Plaintiff consequently asks the Court to find that Defendants have waived these privileges. (Doc. 23 PAGEID 288–89, 290–91 (citing *Casale v. Nationwide Children's Hosp.*, No. 2:11-cv-1124, 2013 WL 12203243 (S.D. Ohio Sept. 13, 2013))). Defendants counter that they "are happy to submit the documents for an *in camera* inspection to the Court to meet their burden of proving that the documents are privileged as claimed." (Doc. 24 PAGEID 307–08).

As Judge Watson noted in *Casale*, "Waiver is a serious remedy, one the Court does not impose lightly." 2013 WL 12203243, at *1. "Although waiver is not an automatic result of Defendant's failure to comply with the discovery rules, the Court has discretion to find waiver." *Id.* at *2 (citing Fed. R. Civ. P. 26(b)(5) 1993 advisory committee notes cmt. & collecting cases). Among the factors that persuaded Judge Watson to find waiver was prejudice to the plaintiff, because "Defendant filed a motion for summary judgment

---

[8] Rule 26(b)(5)(A) provides, "When a party withholds information otherwise discoverable by claiming that the information is privileged or subject to protection as trial-preparation material, the party must: (i) expressly make the claim; and (ii) describe the nature of the documents, communications, or tangible things not produced or disclosed— and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim."

[9] Local Rule 26.1(a) provides in pertinent part, "A privilege log shall list documents, electronically stored information, communications, or tangible things withheld in an organized and logical order and must contain sufficient information to enable an opposing party and the Court to evaluate the applicability of the claimed privilege or protection."

[10] (*See* Docs. 19-5, 19-6, 19-7).

before its violation came to light[ ] . . . [and] certainly intended Plaintiff to have to respond to its summary judgment motion without knowing of the existence of the withheld documents or having the opportunity to contest Defendant's assertion of privilege over those documents, and that is exactly what happened." *Id.* at *4. "In fact, but for Plaintiff's counsel's request to re-open discovery, neither the Court nor Plaintiff would have ever been aware of the withheld documents, and Plaintiff would not have been able to contest the privilege assertions prior to a dispositive ruling on the case." *Id.* "The fact that the motion for summary judgment was stricken and Plaintiff was ultimately able to contest the privilege before briefing summary judgment does not completely negate that prejudice." *Id*. "Moreover, although not all of the depositions are complete, it appears a good portion of witnesses have been deposed. Plaintiff may have used some of the withheld documents during those depositions." *Id.*

The Court is troubled by the fact that Defendants—who are represented by experienced counsel—failed to produce a privilege log: 1) when they first served their discovery responses; 2) after Plaintiff reminded them (repeatedly) of their obligation to do so; 3) after the December 13, 2021 status conference; 4) after Plaintiff filed his Motion to Compel; or 5) to date. That said, in the absence of evidence of bad faith, the Court determines that waiver would be too harsh a result.

Defendants are hereby **ORDERED** to produce a privilege log to Plaintiff on or before October 14, 2022. By the same date, Defendants are also **ORDERED** to deliver a copy of said privilege log and the documents themselves to the Court for *in camera* inspection.

**<u>"Advice of Counsel" Affirmative Defense</u>.** Plaintiff's Complaint contains 13 references to the Village Solicitor. He contends that she "is believed to have been involved in several of the actions taken by Defendants which are at issue in this litigation." (Doc. 19 PAGEID 112). This being the case, Plaintiff maintains that he is entitled to know whether Defendants intend to assert "advice of counsel" as an affirmative defense. Plaintiff's counsel asked Mayor Noble this very question during his deposition. Defense counsel instructed him not to answer, because this "particular" affirmative defense fell within work product protection. (Doc. 19 PAGEID 112–13 & Doc. 19-2).

Defendants respond that they have listed their affirmative defenses in their Answer and "advice of counsel" is not one of them.[11] They then make the circular (and unavailing) argument that they don't know whether "advice of counsel" will be raised as a defense, because it will depend on "the information discovered during the discovery process, whether Plaintiff amends his complaint to set forth new facts or allegations, and the shifting nature of litigation." (Doc. 21 PAGEID 243).

Plaintiff is entitled to an answer to this question. If the answer is no, the discussion ends. But if the answer is yes, then the attorney-client privilege likely is waived and the scope of discovery will change considerably. *See Medpace, Inc. v. Biothera, Inc.*, No. 1:12-cv-179, 2013 WL 5937040, at *3 (S.D. Ohio Nov. 4, 2013) ("[A]ffirmative reliance on the advice of counsel as an aspect of a claim or defense waives the privilege); *United States v. Ohio Edison Co*., No. C2-99-1181, 2002 WL 1585597, at *5 (S.D. Ohio July 11, 2002) ("[A] party must affirmatively use privileged communications to defend itself or

[11] (*See* Doc. 9 (¶¶ 185–206)).

attack its opponent in the action before the implicit waiver rule is applicable.") (cleaned up).[12]

Defendants are hereby **ORDERED** to allow Mayor Noble (and other witnesses competent to testify on behalf of the Village) to answer the question of whether he (and/or the Village) intend to defend the based on the advice of counsel.

**Testimony Regarding Executive Session Discussions.** Village Council, which consists of six members, meets monthly.[13] It also convenes for special meetings. At issue are five meetings that included an executive session[14] where Plaintiff believes discussions took place regarding events that purportedly underpinned the Charges filed against him by Mayor Noble. During their depositions, council members were instructed to not testify regarding matters discussed during these five executive sessions based both on the attorney-client privilege and the "executive session" privilege.

"The burden of establishing the existence of the privilege rests with the person asserting it." *United States v. Dakota*, 197 F.3d 821, 825 (6th Cir. 1999); *McCall v. Procter & Gamble Co.*, No. 1:17-cv-406, 2019 WL 3997375, at *2 (S.D. Ohio Aug. 22, 2019) (citation omitted); *Kamenski v. Wellington Exempted Vill. Sch.*, No. 1:14-cv-01589, 2016 WL 1732872, at *2–4 (N.D. Ohio May 2, 2016) (citation omitted). "If a claim of privilege is challenged, the person asserting it must establish each element by competent

---

[12] *See also State ex rel. Hicks v. Fraley*, 166 Ohio St. 3d 141, 184 N.E.3d 13, ¶ 13 (Ohio 2021) ("In the civil context, asserting the affirmative defense of advice of counsel waives the attorney-client privilege with regard to such advice.").

[13] https://bethel-oh.gov/government/village-council/ (last visited 9/29/2022)

[14] (*See* Doc. 19-8 PAGEID 213 (June 11, 2020), PAGEID 221 (July 9, 2020), PAGEID 222 (Sept. 30, 2020), PAGEID 230 (Dec. 10, 2020), and PAGEID 231 (Feb. 2, 2021)).

evidence." *McCall*, 2019 WL 3997375, at *2 (citing *Cooey v. Strickland*, 269 F.R.D. 643, 649 (S.D. Ohio 2010)). "Determining what constitutes privileged matter requires determining what privilege law applies." *Kamenski*, 2016 WL 1732872, at *2.

The Court begins with Fed. R. Evid. 501, which provides:

> The common law—as interpreted by United States courts in the light of reason and experience—governs a claim of privilege unless any of the following provides otherwise:
>
> - the United States Constitution;
> - a federal statute; or
> - rules prescribed by the Supreme Court.
>
> But in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision.

Plaintiff's Complaint raises federal claims (Count I) as well as supplemental state law claims (Counts II–IX). In cases where the Court has federal question subject-matter jurisdiction, notwithstanding the presence of supplemental state law claims, federal (rather than state) privilege law applies. *Kamenski*, 2016 WL 1732872, at *2 (citing *Hancock v. Dodson*, 958 F.2d 1367, 1373 (6th Cir. 1992)).[15]

**Attorney-Client Privilege.** Governmental entities, like corporations, enjoy the attorney-client privilege. *See Ross v. City of Memphis*, 423 F.3d 596, 600–03, 606 (6th Cir. 2005) (deciding—after previously assuming—that a municipality can assert the attorney-client privilege in civil proceedings).[16] "This privilege is 'the oldest of the

[15] The Court also has diversity subject-matter jurisdiction based on the citizenship of the parties and the amount in controversy. (*See* (Doc. 1 (¶ 5)); 28 U.S.C. § 1332(a)(1). Still, federal law will supply the rule of decision for Plaintiff's § 1983 claims. The Court proceeds on the premise, therefore, that—to the extent there is a conflict—federal privilege law controls.

[16] *See also State ex rel. Nix v. City of Cleveland*, 83 Ohio St. 3d 379, 383, 700 N.E.2d 12, 16 (Ohio 1998). Plaintiff does not dispute this general legal proposition. (Doc. 23 at PAGEID 294).

privileges for confidential communications known to the common law.'" *Id.* at 600 (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)). "The attorney-client privilege is 'narrowly construed because it reduces the amount of information discoverable during the course of a lawsuit.'" *Id.* (quoting *United States v. Collins*, 128 F.3d 313, 320 (6th Cir. 1997)). "However, its scope must be determined in light of its purpose of increasing full and frank communication [between attorneys and their clients]." *Id.* (citing *In re Grand Jury Subpoena* (*United States v. Doe*), 886 F.2d 135, 137 (6th Cir. 1989)). The "essential elements" of the attorney-client privilege are: "(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived." *Fausek v. White*, 965 F.2d 126, 129 (6th Cir. 1992) (cleaned up). "Although important, the attorney-client privilege is not absolute; it applies only to the extent that it services the 'broader public interests.'" *Id.*

Defendants assert the attorney-client privilege as to discussion held during the five executive sessions because the Village Solicitor was present "at all of the meetings and executive sessions[,]" and "[t]here can be no serious question as to whether Ms. Supinger, as Bethel's solicitor, was engaged to give legal advice and counsel to Bethel." (Doc. 21 PAGEID 245). A conclusory assertion in a legal brief, however, does not qualify as competent evidence in support of a privilege. *McCall*, 2019 WL 3997375, at *2 n.4 (citing *Cooey*, 269 F.R.D. at 649)).

The minutes produced by Defendants establish that the Village Solicitor attended all five *meetings*.[17] They do not document who was present during the executive sessions taken *within* those meetings. The Court is unwilling to infer Ms. Supinger's presence during executive session simply because she is listed as "in attendance" at the monthly (and special) meetings.[18] To do so would require the Court to similarly infer that Village Administrator Travis Dotson and Village Fiscal Officer Bill Gilpin were present at the executive sessions.[19] And, if this were the case, it begs the question of whether the privilege would attach because the advice was not "made in confidence" as *Fausek* requires.

"It is clear that the attorney-client privilege will not shield from disclosure statements made by a client to his or her attorney in the presence of a third party, but there is little authority about which agents of an organizational client are the client for purposes of the attorney-client privilege." *Reed v. Baxter*, 134 F.3d 351, 357 (6th Cir. 1998) (citations omitted). The plaintiffs in *Reed* filed an employment discrimination lawsuit against the City of Murfreesboro (Tennessee) and its fire chief relating to fire department promotion practices. *Id.* at 352. At issue was whether two councilmen

[17] (*See* Doc. 19-8 PAGEID 209 (June 11, 2020), PAGEID 215 (July 9, 2020), PAGEID 222 (Sept. 30, 2020), PAGEID 223 (Dec. 10, 2020), and PAGEID 231 (Feb. 2, 2021)).

[18] To be sure, the attorney-client privilege does not attach simply because counsel was "in the room." *Kamenski*, 2016 WL 1732872, at *5. *Kamenski* cites *Maddox v. Bd. of Commrs. of Green Cnty.*, 2014-Ohio-1541, at ¶ 7, 2014 WL 1419453, at *2 (Ohio Ct. App. 2d Dist. Apr. 11, 2014) in support. *Maddox*, relying on both state and federal cases, affirmed the trial court's denial of a protective order in the first instance because it was "unconvinced that the Board met its burden of establishing applicability of the attorney-client privilege[.]" *Id.* "There is a distinction between a conference with counsel and a conference at which counsel is present; the mere presence of counsel at a meeting does not make all communications during the meeting privileged." *Id.* (quoting *New Jersey v. Sprint Corp.*, 258 F.R.D. 421, 444 (D. Kan. 2009))

[19] *See supra* n.14. The Court notes that "Mr. Simmons, Ty Brandenburg, Nick Burns, and Hank Jeffers" also were listed as "in attendance" at the July 9, 2020 meeting. (*See* Doc. 19-8 PAGEID 215).

participated in a meeting with the city attorney (along with the city manager and the fire chief) as "third parties" rather than "clients." *Id.* at 355. Plaintiffs argued on appeal that the district court "misapplied" the law of attorney-client privilege. *Id.* The Sixth Circuit agreed, focusing on the fact that the meeting was not a full meeting of the council called pursuant to a provision of the city code, but, instead, was called by one of the councilmen in response to complaints he had received from constituents about the promotion process. *Id.* at 357. It was, therefore, an instance of "elected officials investigating the reasons for executive behavior[ .]" *Id.* The councilmen called the meeting "not to obtain the advice of the city attorney—who apparently participated in the meeting at the request of [the city manager and the fire chief] . . . but to inquire into the basis for [a] promotion . . . challenged by their constituents as based on race." *Id.* at 358. Because the councilmen participated as third parties, then, "the discussion was not held in confidence for purposes of the attorney-client privilege[ and] not shielded from disclosure by the attorney-client privilege." *Id.* (citation omitted).[20]

Without more facts, the issue of privilege as to the five executive session discussions is not properly framed for decision. Defendants are **ORDERED** to produce competent evidence[21] that documents who was present at each executive session, in what capacity, and for what purpose. The parties shall thereafter reevaluate their

[20] A distinguishing fact in *Reed* is that the authority for promotions rested exclusively with the city manager—city council played no role. *Id.* at 358. Here, by statute, the opposite is true: once charges are filed by the Mayor, Village Council has exclusive authority to decide whether a police chief should be removed for cause. *See* Ohio Rev. Code § 737.171.

[21] Competent evidence "can include sworn statements in affidavits, depositions, and interrogatory answers." *McCall*, 2019 WL 3997375, at *4.

positions and contact the Court (via email to barrett_chambers@ohsd.uscourts.gov) to request a discovery dispute conference (by telephone) to revisit the issue.

**"Executive Session" Privilege.** In a nutshell, Defendants argue that an "executive session" privilege exists based upon the state law exemptions to Ohio's Open Meetings Act (found in Ohio Rev. Code § 121.22(G)(1) & (3)) and the provisions of Ohio Rev. Code § 102.03(B). They rely primarily on an unpublished decision, *Humphries v. Chicarelli*, 554 F. App'x 401 (6th Cir. 2014). Plaintiff counters that a statutory exemption to the open meeting requirement of Ohio's Open Meetings Act does not equate to a stand-alone privilege. He relies primarily on *Kamenski* and *McComas v. Bd. of Educ. Rock Hill Loc. Sch. Dist.*, No. 1-07-CV-573, 2009 WL 10709695 (S.D. Ohio May 11, 2009) (Dlott, J.). Alternatively, assuming federal law recognizes the privilege, it attaches only if the executive session is properly invoked, which could not have occurred here because Plaintiff requested a public hearing pursuant to Ohio Rev. Code § 737.17.

This question need not be decided until (and unless) the Court determines that the attorney-client privilege does not attach to the five executive session discussions. In this regard only, then, both Plaintiff's Motion to Compel and Defendants' companion Motion for Protective Order will be denied without prejudice to renew.

**Chief Hughes.** As he did (through a public records request) prior to the February 2021 hearing, Plaintiff has again asked Defendants to produce Chief Hughes' retention agreement, the material provided to him, and Defendants' communications with him. Defendants have objected, asserting that the materials are protected by the work product doctrine. (Doc. 19 PAGEID 130). As previously discussed, Defendants have failed to produce a privilege log as required under the federal and local civil rules.

Chief Hughes was retained by the Village in September 2020—months prior to the Charges being filed in February 2021—ostensibly to conduct an independent audit and review of the police department and, of course, of Teague as its chief. Plaintiff argues that Hughes could not have been retained in anticipation of litigation unless the decision to terminate had already been made, which would be in violation of Ohio Rev. Code § 737.171.

Not so, Defendants respond, because "[i]t is always possible, in the event a public official, especially a chief of a division, is fired that litigation will result from the termination." (Doc. 21 PAGEID 253). "Bethel's review of the department and Chief's Teague's handling of the protest and other events in the Village indicate that it had concerns with Teague's job performance." (*Id.*). "If the Village took the next step, and decided to file Charges against the Chief, it was likely litigation would (and did) result." (*Id.*). "Chief Hughes' materials are therefore protected work product material and not subject to disclosure in discovery." (*Id.*).

Given the temporal facts alleged in the Complaint, along with the statutes in play, the Court is not inclined to find that work product protection applies. The Court will reserve final ruling, however, until after *in camera* inspection of the relevant documents. As Plaintiff points out, work product protection applies only to "documents and tangible things". *See* Fed. R. Civ. P. 26(b)(3)(A) ("Ordinarily, a party may not discover **documents and tangible things** that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent).") (emphasis added). Thus, to the extent that defense counsel may have instructed a witness (being deposed) not to answer on this basis, that

instruction was improper. *See generally Williams v. Duke Energy Corp.*, No. 1:08-cv-00046, 2014 WL 3895227, at *5 (S.D. Ohio Aug. 8, 2014) (Rule 26(b)(3) does not apply to witness testimony).

**Plaintiff's Cell Phone.** Plaintiff returned his Village-issued cell phone when he was suspended (in January 2021) and again when he resigned (in March 2021). Plaintiff has asked Defendants to produce (for the time-period January 2020 to April 2021) a call log as well as all emails and text messages. (Doc. 19 PAGEID 130–31). During the course of briefing, Defendants produced "over four hundred pages of emails, text messages, and the call log from Teague's Village-issued phone." (Doc. 21 PAGEID 253). Plaintiff seems satisfied that all emails were produced. (Doc. 23 PAGEID 304–05). But no text messages were produced and the call log appears incomplete to Plaintiff. (*Id.*). Defendants respond that they "are under the impression they have provided everything recoverable on the phone . . . [and] will further confer with their expert to confirm this." (Doc. 24 PAGEID 311).

To the extent this matter remains unresolved, Defendants are hereby **ORDERED** to produce the cell phone itself to an expert of Plaintiff's choosing to allow for a second forensic examination (at Plaintiff's expense).

**Specific Interrogatories and Requests for Production of Documents.** To conserve resources, the Court declines to address the specific interrogatories and requests for production of documents that Plaintiff lists, trusting that Defendants will respond in accord with the rulings set forth above. Should there be any further issues, the parties are invited to contact the Court (via email to

barrett_chambers@ohsd.uscourts.gov) to request a discovery dispute conference (by telephone).

## III. Conclusion

Plaintiff's Motion to Compel Defendants to Respond to Discovery and Provide Deposition Testimony (Doc. 19) and Defendants' companion Motion for Protective Order (Doc. 21) are both **DENIED without prejudice to renew** on the issue of "executive session" privilege only. Plaintiff's Motion (Doc. 19) is otherwise **GRANTED** in all other respects and Defendants' companion Motion (Doc. 21) is otherwise **DENIED** in all other respects.

By separate notice, the Court will set a status conference (by telephone) to discuss an amended calendar.

**IT IS SO ORDERED.**

*/s/ Michael R. Barrett*
Michael R. Barrett, Judge
United States District Court